UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHAEL L. SINGLETON II,

                Plaintiff,

    v.

BERNARD WARNER, et al,

                Defendants.

Case No. 3:16-cv-05571-BHS-TLF

REPORT AND RECOMMENDATION

Noted for January 5, 2018

This matter is before the Court on defendants' filing of a motion for summary judgment. Dkt. 23. Plaintiff has brought suit under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq. Plaintiff alleges defendants violated his federal constitutional and statutory rights for removing him from his prison job with Correctional Industries ("CI") based on his race. This matter has been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4). For the reasons set forth below, the undersigned recommends the Court grant defendants' motion and dismiss plaintiff's complaint.

### FACTUAL AND PROCEDURAL HISTORY

During all times relevant to the incident that forms the basis of this action, plaintiff was an inmate at the Stafford Creek Corrections Center ("SCCC") located in Aberdeen, Washington.[1]

---

[1] It appears, however, that plaintiff is no longer in state custody, but rather according to defendants is currently out on community supervision, although plaintiff himself has not notified the Court of any change in his custody status or address. Dkt. 23, p. 20.

Dkt. 7, p. 2. From May 2013, until November 2014, plaintiff worked in the SCCC furniture shop, one of the Correctional Industries programs at that institution. Dkt. 7, p. 7; Dkt. 25, p. 2. The furniture shop makes office furniture for sale to local and state agencies. Dkt. 25, p. 2. CI programs are owned and operated by the Department of Corrections ("DOC"), are administered and supervised by DOC employees, and use inmates to work in those programs. *Id.*, p. 1.

According to defendant Dennis Harmon, who has been the head of Correctional Industries programs at SCCC since September 2015, "[t]hroughout most of his time in the furniture shop [plaintiff] performed well and was rewarded with regular promotions and pay increases." Dkt. 25, p. 2. "Near the end of his time in the SCCC furniture shop, [plaintiff] was the lead furniture sewer and attained the highest pay scale as a level 4 lead." *Id.*

In early November 2014, defendant Harmon and CI employee Sally Thiessen "were advised by two inmates" that plaintiff "was arguing with and bullying inmate Sollesvik to get him out of the furniture shop sewing area," and that plaintiff "aggressively told inmate Sollesvik that if inmate Sollesvik told on [plaintiff], he would have him 'removed at mainline.'" Dkt. 25, p. 2. Plaintiff contests this version of events, claiming instead that on October 29, 2014 inmate Solesvik was creating a work hazard by bringing an unauthorized person into the work area. Dkt. 7, p.7. Mr. Singleton alleges that he told inmate Sollesvik that the unauthorized person could not be there without written authorization as it was a restricted area. *Id.* Plaintiff also claims inmate Sollesvik eventually became argumentative, whereupon plaintiff told him to "[s]top bringing people back here and get back to work, or we can have you removed from the [sewing] line." *Id.*; Dkt. 27, p. 2.

Defendant Harmon states that he and Ms. Thiessen found the two inmates who provided them with the above information to be credible, and therefore Ms. Thiessen wrote infractions on

REPORT AND RECOMMENDATION - 2

plaintiff for "intimidation and threatening." Dkt. 25, p. 2. That information also was provided to custody staff who placed plaintiff in segregation in early November 2014. Dkt. 7, p. 7; Dkt. 25, p. 2. The infraction plaintiff received made him ineligible to work in CI. Dkt. 25, p. 2.

A prison disciplinary hearing was conducted on November 17, 2014, at which plaintiff testified. Dkt. 7, p. 8; Dkt. 27, p. 2. According to defendant Thomas L'Heureux, the DOC disciplinary hearings officer who conducted the hearing, plaintiff "was provided all of the procedural protections provided by DOC's regulations and policies, including at least 24 hours advance written notice of the charges against him, an opportunity to provide witness statements on his behalf, and a summary of the confidential information [from the two inmates] which was contained within the body of the written infraction report." Dkt. 27, p. 2.

Defendant L'Heureux found plaintiff guilty of intimidating another inmate, but not guilty of threatening harm. Dkt. 27, p. 2. Plaintiff was sanctioned 13 days of disciplinary segregation with credit for 13 days of segregation already served. *Id.* Plaintiff appealed the guilty finding. *Id.* That finding was overturned and the infraction dismissed on appeal because of insufficient evidence for a finding of guilt and a procedural error, specifically: "[w]ithout the information from the confidential source the evidence [did] not support the" infraction. Dkt. 27, p. 2; Dkt. 27-1, p. 13.

A Facility Risk Management Team ("FRMT") meeting, chaired by defendant Dennis Cherry, a Correctional Unit Supervisor at the SCCC, was held in late January 2015. Dkt. 26, p. 1. "FRMT meetings are used to either decide or make recommendations on classification questions such as custody levels, housing assignments, and programming decisions, including employment in prison jobs." *Id.* The meeting was requested by Correctional Industries (CI) Manager James Aliff to terminate plaintiff from his CI position, because of plaintiff's behavior in dealing with

1 | another inmate who also worked in CI. *Id.*, pp. 1-2. Plaintiff, along with four correctional counselors including defendants Shannon Weidman and Viola Gorham, and a correctional officer, attended that meeting. *Id.*, p. 2.

Plaintiff states that he explained at the FRMT meeting that he had been absolved of any infraction, and that the only reason he was terminated from his CI position was because of "the policy or practice of ensuring only [C]aucasian inmates were placed in level 4 lead positions." Dkt. 7, p. 9. Plaintiff claims he was terminated from his CI position by full recommendation of the FRMT. *Id.* Defendant Cherry states the FRMT decided not to terminate plaintiff from his CI position but to merely "drop" him from that job. Dkt. 26, p. 2. "Termination from a position," he explains, "indicates the inmate did something wrong to lose his position, whereas being dropped from a position does not imply improper behavior and allows the inmate to immediately obtain another job or position." *Id.*

Defendant Cherry goes on to state that the FRMT had no choice but to drop plaintiff from his job as the FRMT did not have the authority to force CI to rehire him in his former position. Dkt. 26, p. 2. Defendant Cherry further states that the FRMT's decision to drop plaintiff from his CI position "had nothing to do with [plaintiff's] race and was based solely on the fact that [CI] did not want [him] back in the SCCC furniture shop." *Id.*

Defendant Harmon states that in late December 2014 or January 2015, he learned that plaintiff had been found guilty of one infraction, but that that finding was overturned on appeal. Dkt. 25, p. 2. When asked for his opinion on returning plaintiff to his CI position, defendant Harmon states he advised the SCCC Superintendent that he did not want plaintiff to return to the furniture shop due to the inappropriate behavior plaintiff had engaged, in that it "jeopardized the safety, security, and positive work environment of the furniture shop." *Id.*

In early February 2015, plaintiff submitted a complaint through the DOC grievance process concerning the loss of his CI position. Dkt. 28, p. 2. That complaint was dismissed and plaintiff appealed that dismissal to the highest grievance level, thereby exhausting all of his DOC grievance remedies. *Id.* On June 29, 2016, plaintiff filed his civil rights complaint in this Court seeking damages as well as declaratory and injunctive relief under 42 U.S.C. § 1983 against defendants for violations of his First Amendment and Fourteenth Amendment equal protection and due process rights, and for violating his civil rights under Title VII, for removing him from his CI position based on his race.

Defendants argue in their motion for summary judgment that: (1) CI is immune from Section 1983 liability; (2) plaintiff has not shown personal participation on the part of defendants Warner and Glebe; (3) plaintiff has failed to establish a valid Title VII claim, and (4) plaintiff cannot demonstrate defendants violated his First Amendment, due process, or equal protection rights. Defendants further argue they are entitled to qualified immunity. As the parties have now completed their briefing, this matter is ripe for judicial review. For the reasons set forth below, the undersigned agrees with defendants, and therefore recommends that their motion be granted and the complaint be dismissed.

## DISCUSSION

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure ("FRCP") 56(c). In deciding whether summary judgment should be granted, the Court "must view the evidence in the light most favorable to the nonmoving party," and draw all inferences "in the light most favorable" to that party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). When a summary judgment motion is supported as provided in FRCP 56, an adverse

party may not rest upon the mere allegations or denials of his pleading, but his or her response, by affidavits or as otherwise provided in FRCP 56, must set forth specific facts showing there is a genuine issue for trial. FRCP 56(e)(2).

If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. *Id.* The moving party must demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv.*, 809 F.2d at 630.

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Building Prods., Inc.*, 818 F.2d at 1468. In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct complained of was committed by a person acting under color of state law, and (b) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the

United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

I.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity thus shields government officials from money damages, unless the plaintiff "pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quoting *Harlow*, 457 U.S. at 818).

In considering the first prong, the Court must determine whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). With respect to the second prong, an official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 U.S. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This inquiry," furthermore, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The burden is on the plaintiff to show that the right was clearly established. *See Sorrels v. McKee*, 290 F.3d 965, 969 (9th 2002).

1       "If the law did not put the [official] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202; *see also Harlow*, 457 U.S. at 818 ("If the law at the time [the conduct occurred] was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."). As such, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier*, 533 U.S. at 202 (quoting *Malloy v. Briggs*, 475 U.S. 335, 341 (1986)).

      On the other hand, "the very action in question" need not "have previously been held unlawful." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Creighton*, 483 U.S. at 640); *see also Delker v. Maass*, 843 F.Supp. 1390, 1397 (D. Ore. 1994) ("The precise facts need not have been previously determined, so long as the legal principle is clearly established and a reasonable public official would realize that his conduct violated that rule of law."). Nevertheless, "[t]he right the official is alleged to have violated must be made specific in regard to the kind of action complained of for the constitutional right at issue to have been clearly established." *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1100-01 (9th Cir. 1995) (citing *Anderson*, 483 U.S. at 639-40).

      The defense of qualified immunity "has both an 'objective' and a 'subjective' aspect." *Harlow*, 457 U.S. at 815. "The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'" *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland* 420 U.S. 308, 322 (1975)). Thus, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Creighton*, 483 U.S. at 639 (quoting *Harlow*, 457

U.S. at 818-19). Under the subjective element, qualified immunity will be defeated "if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury.'" *Harlow*, 457 U.S. at 815 (emphasis in the original).

A court "may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). For a right to be clearly established, however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al-Kidd*, 131 S.Ct. at 2083). "This is not to say," as noted above, "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Creighton*, 483 U.S. at 640. "[I]n the light of pre-existing law," though, "the unlawfulness must be apparent." *Id.*

Plaintiff raises six claims asserting violations of his statutory and constitutional rights. Specifically, plaintiff alleges:

1. Defendants L'Heureux and John Doe Casey violated his Fourteenth Amendment procedural due process rights by depriving him of notice and to have a summarized version of the confidential information used at his disciplinary hearing.

2. Defendants Harmon, Cherry, Bernard Warner, Tim Thrasher, Patrick Glebe, Shannon Weidman, John Doe Bedwell, and John Doe violated his First Amendment right to petition to redress his grievances in retaliating against him by terminating him from his CI position due to the successful appeal of his infraction.

3. Defendants Harmon and Kerri McTarsney conspired to deprive him of his civil rights by using racial discrimination to remove him from his CI position and by repeatedly attempting to dissuade him from pursing his redress of grievances.

> 4. Defendants CI and Harmon violated Title VII of the Civil Rights Act by removing him from his CI position based on his race.
>
> 5. Defendant Glebe violated his Fourteenth Amendment right to equal protection of the law and to be free of racial discrimination by failing to supervise and manage his subordinate employees and officers.
>
> 6. All Defendants violated his Fourteenth Amendment equal protection rights by treating him differently based on his race.

Dkt. 7, pp. 11-15. But because as explained below plaintiff has not established any of the above claims of statutory or constitutional violations, defendants are entitled to qualified immunity with respect to each of those claims.

### A. Claim 1: Procedural Due Process

Under the Fourteenth Amendment, prisoners "may not be deprived of life, liberty, or property without due process of law." *Wolffe v. McDonnell*, 418 U.S. 539, 556 (1974). However, the protections afforded prisoners are "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id.*; *see also Sandin v. Conner*, 515 U.S. 472, 478 (1995) (noting the "intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due").

"[A] prisoner is entitled to certain due process protections when he is charged with a disciplinary violation." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (citing *Wolff*, 418 U.S. at 564–571). "Such protections include the rights to call witnesses, to present documentary evidence and to have a written statement by the factfinder as to the evidence relied upon and the reasons for the disciplinary action taken." *Id.* at 1077-1078. These protections, though, "adhere only when the disciplinary action implicates a protected liberty interest in some 'unexpected matter' or imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* at 1078 (quoting *Sandin*, 515 U.S. at 484).

"Rather than invoking a single standard for determining whether a prison hardship is atypical and significant," courts "rely on a 'condition or combination of conditions or factors [that] requires case by case, fact by fact consideration.'" *Serrano*, 345 F.3d at 1078 (quoting *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996)). "[T]hree guideposts . . . frame the inquiry: (1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Id.* (quoting *Sandin*, 515 U.S. at 486–487; *Keenan*, 83 F.3d at 1089).

"Typically, administrative segregation in and of itself does not implicate a protected liberty interest." *Serrano*, 345 F.3d at 1078. As the Supreme Court has noted, "disciplinary segregation, with insignificant exceptions, mirror[s] those conditions imposed on inmates in administrative segregation and protective custody." *Sandin*, 515 U.S. at 486; *see also Wagner v. Hanks*, 128 F.3d 1173, 1174 (7th Cir.1997) ("[I]t would be difficult . . . to make disciplinary segregation sufficiently more restrictive than the conditions of the general population . . . to count as an atypical and significant deprivation of liberty[.]"). A prisoner "has 'no liberty interest in freedom from state action taken within the sentence imposed,'" and as the Ninth Circuit has found "administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *Sandin*, 515 U.S. at 480).

Plaintiff has not shown his placement in administrative segregation was an atypical or significant hardship falling outside the terms of his confinement. Indeed, as noted above, such placement is considered to fall within those conditions typically imposed on prisoners, absent

some showing to the contrary. Thus, plaintiff has failed to establish the existence of a protected liberty interest. Nevertheless, the record shows plaintiff received all the process he was due in regard to the discipline he received.

Plaintiff alleges defendants Casey and L'Heureux deprived him of his due process right to notice and to have a summarized version of the confidential information that was used at his disciplinary hearing. But plaintiff admits that he was placed in administrative segregation on November 5, 2014, "pending a serious infraction disciplinary hearing," which was held 12 days later, and that the "[t]he administrative 'Infraction Review Checklist' authorizing [his] placement in segregation was signed by [defendant] Casey on November 5, 2014." Dkt. 7, pp. 7-8; *see also* Dkt. 27-1, p. 2. Further, a Disciplinary Hearing Notice/Appearance Waiver regarding the serious infractions was issued on November 6, 2014, with an initial hearing scheduled date of November 10, 2014. Dkt. 27-1, p. 4.

Accordingly, it appears plaintiff had ample notice of the disciplinary hearing. In addition, while plaintiff claims defendants Casey and L'Heureux deprived him of his due process right to have a summarized version of the confidential information used at the disciplinary hearing, he makes no factual showing that it was withheld from him. Instead, plaintiff admits that in the Infraction Review Checklist he signed, defendant Casey "warranted that confidential information . . . was summarized and included with the infraction report." Dkt. 7, p. 8. Plaintiff's claims that he was deprived of this summary are therefore conclusory, and as such are insufficient to defeat a motion for summary judgment. *Lujan*, 497 U.S. at 888. Even if plaintiff was deprived of that summary, furthermore, there would still be no due process violation given that as just discussed, he does not have a liberty interest in being free from administrative segregation.

B. Claim 2: Right to Redress Grievances

Prisoners "have the right to petition the Government for redress of grievances." *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) (First Amendment precludes prison authorities from penalizing prisoners from exercising right to petition government for redress of grievances). Further, "a chilling effect on a prisoner's First Amendment right to file prison grievances is sufficient to raise a retaliation claim." *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003); *Bradley*, 64 F.3d at 1279 (the right of meaningful access to the courts extends to established prison procedures).

Plaintiff argues defendants Warner, Thrasher, Glebe, Harmon, Cherry, Weidman, Gorham, and Bedwell violated his First Amendment right to petition the government to redress his grievances by terminating him from his CI position due to the successful appeal of his infraction. However, plaintiff has not come forth with specific facts showing this to be the case. Instead, the evidence before the Court indicates that plaintiff was not allowed to return to his CI position at the request of CI, because of what was deemed his inappropriate behavior with another inmate, even though the infractions against plaintiff were eventually dismissed. Other than his general contention that his successful appeal was the basis for his termination, nothing in the record indicates that this is why plaintiff was removed from his position.

In addition, of the eight named defendants that plaintiff claims retaliated against him by not allowing him to return to his CI position, the evidence reveals that only defendant Harmon, Weidman, and Gorham could be said to have been involved in the actual decision to prevent his return. To state a Section 1983 claim, though, plaintiff must allege facts showing how each named defendant caused or personally participated in causing the harm claimed. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988)

(a person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]") (emphasis in original) (citation omitted) . Here, the facts show that only defendants Harmon, Weidman, and Gorham were involved in the decision to remove plaintiff from his position, and therefore the other five named defendants cannot be held liable on this issue.

C. Claim 3: Conspiracy

A claim that state officials conspired to deprive plaintiff of his constitutional rights is cognizable under 42 U.S.C. § 1983. *Duff v. Coughlin*, 794 F. Supp. 521, 525 (S.D.N.Y. 1992); *see also Degrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000). To support such a claim, however, plaintiff must demonstrate defendants "acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds'" in violation of his constitutional rights. *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (quoting *Duff*, 794 F. Supp. at 525). "Conclusory, vague and general allegations of conspiracy" are not sufficient. *Id.*; *Radcliffe v. Rainbow Construction Co.*, 254 F.3d 772, 783-84 (9th Cir. 2001) (bare allegation of joint action will not suffice). Thus, to be liable "each [defendant] must at least share the common objective of the conspiracy." *Steelworkers*, 865 F.2d at 1541; *see also United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (an agreement or a "meeting of the minds" to violate the plaintiff's constitutional rights must be shown).

Plaintiff alleges defendants Harmon and McTarsney conspired to violate his civil rights by using racial discrimination to remove him from his CI position and by repeatedly attempting to dissuade him from pursing his redress of grievances. Plaintiff, however, has not come forth with any facts to show defendant McTarsney personally caused or otherwise participated in his

removal from his CI position – or conspired to do so – or dissuaded him from filing grievances. *Leer*, 844 F.2d at 633; *Arnold*, 637 F.2d at 1355. Likewise, plaintiff fails to establish defendant Harmon conspired with defendant McTarsney to violate his civil rights. And as discussed above, there is no evidence to suggest defendant Harmon acted to prevent plaintiff from returning to his CI position for any reason other than his inappropriate behavior.

    D.    <u>Claim 4: Title VII Violation</u>

Plaintiff argues defendants CI and Harmon violated Title VII of the Civil Rights Act by removing him from his CI position based on his race. As for defendant CI, under the Eleventh Amendment a state is not subject to suit by its own citizens in federal court. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). As an arm of the state, a state agency also is immune from suit. *See Howlett v. Rose*, 496 U.S. 356, 365 (1990); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). Further, an entity that has Eleventh Amendment immunity is not a "person" within the meaning of 42 U.S.C. § 1983.[2] *Howlett*, 496 U.S. at 365. Because CI programs "are owned and operated by [the] DOC," defendant CI is subsumed within the DOC, and therefore is both immune from suit and not a "person" within the meaning of Section 1983.

In addition to being owned and operated by the DOC, CI programs are administered and supervised by DOC employees. Dkt. 25, p. 1. CI does not use non-DOC employees to operate its programs or supervise inmates. *Id.* The DOC has been vested with "the power to provide for a comprehensive inmate work program," and is required to have a division for correctional industries. RCW 72.09.060; RCW 72.09.100. Further, "[e]very prisoner in a state correctional facility shall be required to work in such manner as prescribed by the [DOC] secretary, other

---

[2] Section 1983 reads in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

REPORT AND RECOMMENDATION - 15

than for the private financial benefit of any enforcement officer." RCW 72.64.030. In addition, the DOC is:

> authorized and empowered to cause the inmates in the state institutions of this state to be employed in the rendering of such services and in the production and manufacture of such articles, materials, and supplies as are now, or may hereafter be, needed by the state, or any political subdivision thereof, or that may be needed by any public institution of the state or of any political subdivision thereof.

RCW 72.60.110. On the other hand, the Washington State legislature has made it clear that "[n]o inmate compensated for work in correctional industries shall be considered as an employee or to be employed by the state or the [DOC]." RCW 72.60.100.

Accordingly, although plaintiff did have a position in the SCCC's furniture workshop – a CI program – under state law he was not considered to be an employee of CI, the DOC, or the state. The protections of Title VII, however, "apply only where there is some connection with an employment relationship." *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (quoting *Baker v. McNeil Island Corrections Center*, 859 F.2d 124, 127 (9th Cir. 1988)). "Whether a plaintiff is an 'employee' for purposes of Title VII is a question of federal law." *Id.* (citing *Calderon v. Martin County*, 639 F.2d 271, 272-73 (5th Cir. 1981)).

In *Meese*, the Tenth Circuit concluded that the plaintiff, an inmate in federal prison, was not an employee under Title VII "because his relationship with the Bureau of Prisons [arose] out of his status as an inmate, not an employee." *Meese*, 926 F.2d at 997. The Tenth Circuit noted that while the plaintiff's relationship with the defendants "may contain some elements commonly present in an employment relationship, it arises 'from [his] having been convicted and sentenced to imprisonment in the [defendants'] correctional institution," and that "[t]he primary purpose of their association [is] incarceration, not employment." *Id.* (citation omitted). As such, no claim for discrimination could be pursued under Title VII. *Id.*

REPORT AND RECOMMENDATION - 16

Thus, at least in so far as an inmate's relationship to CI is "penological, not pecuniary," that inmate is not an employee under federal law, including Title VII. *See Coupar v. U.S. Dept. of Labor*, 105 F.3d 1263, 1265-66 (9th Cir. 1997) ("[A]s an inmate [plaintiff] was obligated to work at some job pursuant to a prison work program. . . . That fact brings him within the rule of *Hale*."); *Hale v. State of Arizona*, 993 F.2d 1387, 1395 (9th Cir. 1993) ("Because [plaintiffs] worked for programs structured by the prison pursuant to the state's requirement that prisoners work at hard labor, the economic reality is that their labor belonged to the institution," and thus "they were not 'employees' of the prison entitled to be pain a minimum wage under the [Fair Labor Standards Act ('FSLA')]."); *see also Morgan v. MacDonald*, 41 F.3d 1291, 1292 (9th Cir. 1994) ("[I]nmates cannot be deemed employees under the FSLA when they work for prison-run industries and are statutorily required to work as a term of their confinement.").

Where a prisoner alleges that he has been denied a position in a prison that "would have given him an opportunity to become an employee" of the state, that prisoner may potentially be able to assert a Title VII claim. *Coupar*, 105 F.3d at 1266 (discussing and distinguishing *Baker v. McNeil Island Corrections Center*, 859 F.2d 124, 126 (9th Cir. 1988) (holding that an inmate had stated a Title VII claim when he alleged the prison library position he sought, and which he had alleged he was denied based on his race, would have given him the opportunity to become a state employee)). As in *Coupar*, however, in this case "[t]here is no question on [the] record that [plaintiff's] work was in the prison setting and context, and that his work fulfilled a requirement of his imprisonment." *Id.* Indeed, plaintiff makes no showing that his CI position placed him in the role of being an actual employee of CI, the DOC or the state, rather than it being a statutory requirement as part of his condition of confinement.[3]

---

[3] In addition, other than his conclusory allegations that race was the motivating factor of his removal, plaintiff offers no actual evidence that such was the case. Indeed, as defendants point out, there is no dispute that plaintiff was both

E. Claim 5: Failure to Supervise

Plaintiff argues defendant Glebe violated his Fourteenth Amendment right to equal protection of the law and to be free of racial discrimination, by failing to supervise and manage his employees and officers. Government officials, however, "may not be held liable for the unconstitutional conduct of their subordinates." *Ashcroft v. Iqbal*, 566 U.S. 662, 676 (2009). "Because vicarious liability is inapplicable to" Section 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's *own* individual actions, has violation the Constitution." *Id.* (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1085 (9th Cir. 2014). As a "predicate for section 1983 liability, therefore, plaintiff must establish personal participation by defendant Glebe. *Johnson v. Duffy*, 588 F.2d 740, 744 (9th Cir. 1978). Other than defendant Glebe's supervisory responsibility, though, plaintiff has failed to do so. As such, plaintiff has not shown defendant Glebe to be liable here.

F. Claim 6: Equal Protection

Plaintiff claims that all named defendants violated his equal protection rights by treating him differently from Caucasian inmates based on his race. This claim too fails. For the reasons already discussed above, defendant CI – as a division within a state agency – is immune from section 1983 liability. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). As an arm of the state, a state agency also is immune from suit. *See Howlett v. Rose*, 496 U.S. 356, 365 (1990); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). Further, an entity that has Eleventh Amendment immunity is not a "person" within the meaning of 42 U.S.C. § 1983. *Howlett*, 496 U.S. at 365. As for the remainder of the named defendants, plaintiff has not made the requisite factual showing.

---

promoted and received pay raises, eventually attaining the highest level CI position in the SCCC's furniture shop not long before his removal from that position. Dkt. 7, p. 7; 25, p. 2.

To set forth a *prima facie* violation of the Equal Protection Clause a plaintiff first must prove a discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 763 (9th Cir. 1991). Conclusory allegations by themselves do not establish an equal protection violation without further proof of invidious discriminatory intent. *Village of Arlington Heights*, 429 U.S. at 265. As also discussed above, the record shows plaintiff received promotions and pay raises that eventually culminated in him being placed in the highest level CI position in the SCCC furniture shop. There also is no evidence of any racial animus on the part of the named defendants other than plaintiff's own conclusory allegations. Rather, the record supports defendants' assertion that plaintiff was removed from his CI position because of his inappropriate behavior toward another inmate. As such, plaintiff has not established an equal protection violation.

II.     Request for Injunctive Relief

In addition to damages, plaintiff has requested permanent injunctive relief in the form of a prohibition against defendants' violations of his constitutional and statutory rights. Plaintiff, though, has not established any such violation. Further, as noted above, plaintiff is no longer in the custody of the state, but instead has been released to community supervision. "An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies." *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) (agreeing with defendants that the plaintiff's transfer to another prison muted the district court's grant of injunctive relief). A request for injunctive relief is not moot where the case "is 'capable of repetition, yet evading review.'" *Dilley*, 64 F.3d at 1368 ( citing *Roe v. Wade*, 410 U.S. 113, 125 (1973); *Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911)).

"This exception to the mootness doctrine applies when (1) the challenged action is too short in duration to be fully litigated prior to its expiration and (2) there is a reasonable expectation that the injury will occur again." *Dilley*, 64 F.3d at 1368 (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Here, however, there is no evidence to suggest plaintiff will return to the SCCC at any time in the foreseeable future, even though he remains under community supervision. *Id.* at 1369 (noting that the plaintiff had not demonstrated a reasonable expectation he would be sent back to the transferring prison and subjected again to the alleged harm). Accordingly, plaintiff's request for injunctive relief in this case is moot.

## CONCLUSION

Based on the foregoing discussion, because plaintiff has failed to establish any violation of his federal constitutional or statutory rights, the undersigned recommends the Court GRANT defendants' motion for summary judgment and DISMISS plaintiff's complaint.

The parties have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating this time limitation, this matter shall be set for consideration on January 5, 2018, as noted in the caption.

Dated this 19th day of December, 2017.

*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20